867 F.2d 151
 CABLE INVESTMENTS, INC., Appellant,
v.
Mark WOOLLEY; Waterford Associates, a Pennsylvania limited
partnership; Cold Springs Apartment Associates, a
Pennsylvania limited partnership; First Investors General,
Inc.; and MGM Enterprises, Inc.
 No. 88-5413.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1988.
Decided Jan. 31, 1989.
 
 Harvey Freedenberg (argued), Alan R. Boynton, Jr., McNees, Wallace & Nurick, Harrisburg, Pa., for appellant.
 Deborah C. Costlow (argued), Gretchen L. Lowe, Piper & Marbury, Washington, D.C., for appellees.
 Before SLOVITER and HUTCHINSON, Circuit Judges, and DEBEVOISE, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 At issue in this case is the right of plaintiff-appellant Cable Investments, Inc., a provider of cable television service, to require the owners of two apartment complexes to give it access to the premises so that it can provide its cable services to the tenants. The district court dismissed Cable Investments' suit, Cable Investments, Inc. v. Woolley, 680 F.Supp. 174 (M.D.Pa.1987), and for the reasons that appear below, we will affirm.
 
 I.
 Background
 A.
 
 2
 Defendant Mark Woolley is a general partner in defendant Waterford Associates and defendant Cold Springs Apartment Associates, both Pennsylvania limited partnerships, and is a major stockholder in defendant MGM Enterprises, Inc. (MGM) and defendant First Investors General, Inc., both Pennsylvania corporations (collectively referred to for convenience as "Waterford Associates"). Waterford Associates owns two apartment complexes, Coventry at Waterford and King's Arms at Waterford (collectively "Waterford"), both located in York Township, York County, Pennsylvania.
 
 
 3
 Cable Investments offers cable television service to subscribers in York Township pursuant to a nonexclusive franchise granted it by the township. It provided cable television service to Coventry at Waterford beginning in 1979, and prior thereto through its predecessor, Keystone Communicable, Inc. As of August 1, 1985, Cable Investments served 189 subscribers out of the 288 units in Coventry at Waterford. Cable Investments began providing cable television service to King's Arms at Waterford after it had prewired the units during their construction, beginning in October 1984. As of August 1, 1985, Cable Investments provided service to 16 of the 60 units in the complex. There is no written agreement between Cable Investments and Waterford Associates for the provision of cable television at Waterford, and Cable Investments does not claim that it has any right based on contract.
 
 
 4
 In July 1985, Waterford Associates notified Cable Investments that as of August 1, 1985, it would no longer be permitted to provide cable television service to Waterford, and notified the Waterford tenants that Cable Investments would no longer provide such service. Although Waterford Associates requested Cable Investments to remove its equipment (primarily amplifiers placed along the cables on Waterford property), Cable Investments refused to do so. On approximately August 1 Waterford Associates disconnected Cable Investments' system. Thereafter, MGM began offering cable service to Waterford tenants through a satellite dish erected on the Waterford premises.
 
 
 5
 On September 10, 1985, Cable Investments initiated this suit in federal court based on a variety of federal and state claims and sought damages and injunctive relief to require Waterford Associates to permit Cable Investments to continue to offer its cable television service to Waterford Associates' tenants. On December 29, 1987, the district court granted Waterford Associates' motion to dismiss the claims alleging violation of Cable Investments' rights under the First Amendment, the Cable Communications Policy Act of 1984, 47 U.S.C. Sec. 521 et seq. (Supp. IV 1986), the free speech clause of the Pennsylvania Constitution, and Pennsylvania's Landlord and Tenant Act, 68 Pa.Stat.Ann. Sec. 250.554 (Purdon Supp.1988). Cable Investments subsequently voluntarily dismissed the remainder of its claims, thereby rendering the district court's order dismissing the four claims a final order from which Cable Investments appeals.
 
 B.
 
 6
 While a detailed understanding of the technicalities of the provision of cable television service is not essential to the disposition of the issues before us, a brief description will be useful. A cable television company receives television signals via, inter alia, a satellite link and/or an antenna tower at its receiving stations, called cable headends, processes the signals in form for conversion into television programming, and distributes the signals to the communities it serves through coaxial cables along trunk lines, which may be strung along telephone poles or placed underground following public rights of way. From the trunk lines, distribution (or feeder) lines run onto the property of subscribers. Distribution lines can also be aerial or underground. It is obviously desirable for the cable company to place its distribution lines in trenches dug by the telephone or utility companies during the construction of houses or apartments, thereby avoiding the additional expense of opening and closing the trenches or installing and maintaining an aerial system. Both trunk lines and distribution lines periodically have amplifiers to boost the signals, because signal power gradually diminishes as distance is traversed.
 
 
 7
 The distribution lines are connected to tap units, or distribution boxes, affixed, in this case, to the outside of the apartment buildings. From these tap units, drop lines extend to individual apartments. If the drop lines are installed during the construction of a multi-dwelling unit, the wiring can be placed inside the walls of the building and provide access to an individual apartment through an outlet similar to an electrical outlet. Such prewiring is a cheaper, more aesthetically pleasing, and more convenient alternative to postwiring after construction is complete and the residents have moved into the apartments. Postwiring requires that wires be strung either on the outside of buildings or on the inside along halls or through completed walls and ceilings/floors. In addition, because the wires ultimately must run into individual units, postwiring requires coordination with the residents of the building. See generally United States Dep't of Commerce, Video Program Distribution and Cable Television: Current Policy Issues and Recommendations, app. B at 3-6 (National Telecommunications and Information Administration Report No. 88-233, 1988) (hereinafter Department of Commerce Report).
 
 II.
 
 8
 The Cable Communications Policy Act of 1984
 
 A.
 
 9
 Cable Investments argues first that its right of access to and including the interior of a multi-unit dwelling for the purpose of offering cable television service can be derived from the Cable Communications Policy Act of 1984, 47 U.S.C. Sec. 521 et seq. (Supp. IV 1986) (the Cable Act).
 
 
 10
 In support of its motion to dismiss, Waterford Associates argued, and the district court agreed, that no private right of action by a franchisee can be implied under the Cable Act. Instead, the district court held, enforcement should be left to the franchising authority. 680 F.Supp. at 179. The district court's opinion was issued shortly before the decision of the Eleventh Circuit holding that section 621(a)(2) does create a cause of action in favor of a cable company. See Centel Cable Television Co. v. Admiral's Cove Assocs., 835 F.2d 1359 (11th Cir.1988) (holding Congress provided a right of action to a cable company seeking to place its cable in open trenches through easements listed on recorded plats provided by a residential developer for electric and telephone utilities). While we intimate no opinion on a private right of action under the Centel facts, we note that the substantive right sought to be enforced in Centel is more limited than that sought here, where Cable Investments seeks access to tenants inside buildings owned by Waterford Associates.
 
 
 11
 Generally, in cases considering whether a private right of action can be implied, the substantive right at issue has been established or assumed, and the only issue is whether it can be enforced and by whom. That is not the case with the right of a cable television company to provide service and utilize facilities within a private apartment complex. Because it appears more orderly to decide first whether the statute gives a substantive right of access to multi-unit dwellings before reaching the issue of who can enforce any such right,[1] we asked the parties to brief the substantive issue, which had been raised but not decided in the district court. It is an issue of law, which the parties agree it is appropriate for us to decide.
 
 B.
 
 12
 The Cable Act created a new framework for the regulation of the rapidly developing cable television industry. The overall purpose of the Act is to "(1) establish a national policy concerning cable communications; (2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community; (3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems; (4) assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public; (5) establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by this subchapter; and (6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. Sec. 521.
 
 
 13
 As the Supreme Court noted recently, the Cable Act left franchising to state or local authorities. See City of New York v. FCC, --- U.S. ----, 108 S.Ct. 1637, 1641, 100 L.Ed.2d 48 (1988). The same section of the Cable Act, section 621(a), that provides for the award of franchises, see 47 U.S.C. Sec. 541(a)(1), also authorizes the franchisee to construct its system over public rights-of-way and easements dedicated for compatible uses, see 47 U.S.C. Sec. 541(a)(2). It is the latter provision on which Cable Investments relies for its claim of a statutory right to offer cable television service to Waterford's tenants. The relevant language provides:
 
 
 14
 Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is [sic] within the area to be served by the cable system and which have been dedicated for compatible uses....
 
 
 15
 47 U.S.C. Sec. 541(a)(2).
 
 
 16
 Cable Investments recognizes that its attempt to compel access to the Waterford tenants cannot be grounded on its statutory right to construct its cable system "over public right-of-way." It has not suggested that there is any public right-of-way through which it can place the final cable connections needed to hook up its service to multi-unit dwellings. Instead it argues that the statutory right to construct its system "through easements" gives it access over any easements which have been set aside for uses compatible with cable television, including those under private arrangement with the owner.
 
 
 17
 Under its argument, if property owners grant easements to utilities through which cable companies could install their wiring, then the cable companies can compel the owners of a multi-unit dwelling, such as Waterford, to give them access to the private property and inside the apartment buildings themselves. Specifically, it argues that "Section 621(a)(2) [47 U.S.C. Sec. 541(a)(2) ] allows cable operators such as Cable Investments to use any easements which have been dedicated to a use compatible with the provision of cable television, not just those which are on the exterior of buildings. To the extent that the easements continue into buildings, Section 621(a)(2) requires access." Supplemental Brief of Appellant at 3 (emphasis in original).
 
 
 18
 We find no support in the express language of the statute for Cable Investments' position that Congress authorized franchised cable companies to force their way onto private property, over the protests of the property owner, in order to offer cable television service to the tenants of the property owner. The statute does not define the term "easements" or "dedicated for compatible uses." In light of this ambiguity, we turn for guidance to the legislative history.
 
 C.
 
 19
 The Report from the House Committee on Energy and Commerce, the principal source of legislative history on the Cable Act, states that,
 
 
 20
 Subsection 621(a)(2) [codified at 47 U.S.C. Sec. 541(a)(2) ] specifies that any franchise issued to a cable system authorizes the construction of a cable system over public rights-of-way, and through easements, which have been dedicated to compatible uses. This would include, for example, an easement or right-of-way dedicated for electric, gas or other utility transmission. Such use is subject to the standards set forth in section 633(b)(1)(A), (B) and (C). Consideration should also be given to the terms and conditions under which other parties with rights to such easements and rights-of-way make use of them. Any private arrangements which seek to restrict a cable system's use of such easements or rights-of-way which have been granted to other utilities are in violation of this section and not enforceable.
 
 
 21
 H.R.Rep. No. 934, 98th Cong., 2d Sess. 59, reprinted in 1984 U.S.Code Cong. & Admin.News 4655, 4696.
 
 
 22
 As is evident, this excerpt provides only limited guidance on the question before us. Although it clarifies that a cable television franchisee may use easements dedicated for electric, gas or other utilities, it does not illume the critical issue, whether those easements are considered to run up to as well as into an apartment building for purposes of mandatory access. The final sentence of the excerpt, as Cable Investments emphasizes, provides that private attempts to restrict access are null, but inasmuch as the sentence is explicitly limited to "such" easements as are covered by the section, this obviously begs the question.[2]
 
 
 23
 We find more guidance in the legislative history of section 633, referred to in the foregoing excerpt of the Report. Section 633, which was originally included in the bill as it was reported out of the House Committee on Energy and Commerce, did expressly provide for mandatory access to tenants within a multi-unit dwelling. The relevant language was:
 
 
 24
 Sec. 633. (a) The owner of any multiple-unit residential or commercial building or manufactured home park may not prevent or interfere with the construction or installation of facilities necessary for a cable system, consistent with this section, if cable service or other communications service has been requested by a lessee or owner ... of a unit in such a building or park.
 
 
 25
 H.R. No. 4103, 98th Cong., 2d Sess. Sec. 633 (1984); reprinted in H.R.Rep. No. 934, 98th Cong., 2d Sess. 13.
 
 
 26
 What is significant for our purposes is that section 633 was dropped from the bill that was passed by Congress. The fact that section 633 was not part of the Act as it ultimately emerged from Congress is a strong indication that Congress did not intend that cable companies could compel the owner of a multi-unit dwelling to permit them to use the owner's private property to provide cable service to apartment dwellers. See Russello v. United States, 464 U.S. 16, 23-24, 104 S.Ct. 296, 300-01, 78 L.Ed.2d 17 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."); Thompson v. Kennickell, 797 F.2d 1015, 1024-25 (D.C.Cir.1986) (finding deletion of provision to contribute to evidence of congressional intent).
 
 
 27
 The absence of a mandatory access provision in the bill as finally enacted was specifically remarked upon by Congressman Wirth, the chairman of the Subcommittee on Telecommunications of the House Energy and Commerce Committee from which the bill emanated. Representative Wirth was one of the original sponsors of the bill and had been in favor of the multi-unit dwelling provision. After its deletion, he stated:
 
 
 28
 The purpose of [section 633] was to ensure that all consumers including those who reside in apartments and mobile home parks, had the opportunity to receive cable service.... The provision prohibited landlords from interfering with a consumer's ability to receive cable service--an increasing [sic] troublesome problem whereby landlords become the ultimate electronic editors, deciding to what sources of electronic information, if any, a consumer shall have access.
 
 
 29
 A number of States have enacted laws to provide for citizen access so that consumers would not be denied access to the increasing wealth of programming and services available over cable television. I applaud these efforts and, of course, the fact that a similar provision is no longer part of [the bill] in no way affects the applicability of those State laws. I hope my colleagues will join with me in the future to see to it that a similar Federal provision is enacted.
 
 
 30
 16 Cong.Rec. H10435 (daily ed. Oct. 1, 1984) (statement of Rep. Wirth) (emphasis added).[3]
 
 
 31
 In addition, Representative Fields, also a member of the House Energy and Commerce Committee, who had opposed the mandatory access provision, commented as follows on the final version:
 
 
 32
 I am particularly pleased with the version of the legislation before us today which differs slightly from the bill reported from the Commerce Committee in June. The bill before us today does not contain a provision I had particular concern about in committee, the so-called consumer access to cable.
 
 
 33
 Under that provision, if one tenant in an apartment building requested cable, a property owner would have been forced to wire the entire building. Although I concur with the intent of this provision, to make cable service available to the greatest number of individuals, I believe this goal can be achieved in a better, more orderly manner through a negotiated agreement between the cable operator and the property owner, and not by legislative fiat as this legislation had provided.
 
 
 34
 Fortunately, since the time of the committee markup anid [sic] following the most recent series of negotiations between representatives from the cities and the cable industry, this objectionable section was deleted from this legislation, thus clearing the way for what I hope will be early enactment of H.R. 4103.
 
 
 35
 Cong.Rec. H10444 (daily ed. Oct. 1, 1984) (statement of Rep. Fields) (emphasis added). The statements by congressmen on both sides of the issue are particularly strong evidence that the Cable Act contains no provision mandating access to private apartments.
 
 
 36
 Further evidence that Congress acted deliberately in eliminating the cable companies' mandatory access to multi-unit dwellings that would have been granted by the original bill is the fact that the Cable Act as ultimately passed encompasses some of the protections for property owners that the deleted section 633 provided, but not those requiring just compensation for takings. As drafted, section 633(b)(1)(A), (B) and (C), set out in the margin,[4] required that regulations be promulgated to safeguard the safety, functioning and appearance of property affected by the installation of cable facilities, to place the cost of installation, construction, operation or removal of cable facilities on the cable operator and/or subscriber, and to provide just compensation by the cable operator for any damages caused thereby. These sections were moved verbatim into section 621 of the Act, 47 U.S.C. Sec. 541, when section 633 was deleted from the bill and now appear in 47 U.S.C. Sec. 541(a)(2)(A)-(C), the only difference being that in lieu of requiring regulations by the FCC or the franchising authority, the statute as enacted requires that these matters be ensured by the cable operator.[5]
 
 
 37
 On the other hand, the subsections of section 633 that were not carried over into section 621 of the Cable Act would have required the prescribing of regulations to provide "methods for determining just compensation" under this section, section 633(b)(1)(D), and would have required that such regulations consider the extent of physical occupation, the long-term damage, and the extent of interference with normal use and enjoyment of the property caused by the cable system.[6]
 
 
 38
 The House Committee Report explains that this subsection of section 633 was a conscious attempt to create a mechanism for providing just compensation to property owners. See House Report No. 934 at 80-81; 1984 U.S.Code Cong. & Admin.News at 4717-18. The Report states that Congress included the compensation mechanism "[i]n order to comply with the constitutional requirements" of Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that New York law granting cable television companies right to place wires across private property worked a taking of private property). House Report No. 934 at 81; 1984 U.S.Code Cong. & Admin.News at 4718. Congress' failure to transfer to section 621 the subsections requiring regulations that guaranteed just compensation for takings and enumerating the factors to consider in calculating just compensation suggests that Congress recognized that once it deleted the provision for mandatory access to multiple unit dwellings, it need no longer be concerned with the "taking" issue.
 
 
 39
 Just compensation for the value of the property taken is to be distinguished from just compensation for damages, which was the subject of a separate provision in section 633 and which was transferred to section 621. See 47 U.S.C. Sec. 541(a)(2)(C). Although two district courts have suggested that section 621(a)(2)(C) does incorporate section 633's provisions for just compensation for the taking of the owner's property that mandatory access entails, Greater Worcester Cablevision, Inc. v. Carabetta Enterprises, Inc., 682 F.Supp. 1244, 1259 (D.Mass.1985); Cable Holdings, Inc. v. McNeil Real Estate Fund IV, Ltd., 678 F.Supp. 871, 873-74 (N.D.Ga.1986), we find them unpersuasive in light of the legislative history. Section 633 as drafted contained both subsection (b)(1)(C), requiring regulations providing for just compensation for damages, and subsection (b)(1)(D), requiring regulation of methods for determining just compensation. It is unlikely that they were intended to cover the same thing, particularly since subsection (d), which listed the factors to be considered in prescribing methods of just compensation for a taking, cross-referenced subsection (b)(1)(D) but not (b)(1)(C). Congress recognized the distinction between the damages for which the cable company must compensate under subsection 621(a)(2)(C) and long-term damages which are to be considered in determining just compensation for a taking, which were the subject of the deleted subsection 633(d)(2).
 
 
 40
 In light of Congress' deletion of the provisions that insured payment for the value of property taken pursuant to the mandatory access provision, we read the requirement in section 621(a)(2)(C) that owners be "justly compensated" by the cable operator for any damages to be unrelated to any takings issue. See INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987) (" 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language.' ") (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 392-93, 100 S.Ct. 1723, 1741-42, 64 L.Ed.2d 354 (1980) (Stewart, J., dissenting)).
 
 
 41
 Finally, were there any lingering doubt from the legislative history that the version of the Cable Act ultimately enacted does not contemplate mandating installation and operation of cable facilities in a multi-unit dwelling over the objection of the owner, they should be laid to rest by the deletion in the Cable Act of the subsection of section 633 that prohibited owners of multi-unit dwellings from demanding more than just compensation. Section 633(c) would have provided: "Any owner of such a multiple-unit building or park may not demand or accept payment from any cable operator in exchange for permitting construction or installation of facilities necessary for a cable system on or within the premises in excess of any amount which constitutes just compensation." H.R. No. 4103, 98th Cong., 2d Sess. Sec. 633(c) (1984), reprinted in H.R.Rep. No. 934, 98th Cong., 2d Sess. 13. Its deletion is explicable only if Congress recognized that the bill as enacted did not provide for mandatory installation of cable facilities in such multi-unit buildings.
 
 
 42
 The deletion of section 633 in the final version of the Cable Act, the transfer of some of its provisions to section 541 but not those provisions detailing the factors to be considered in arriving at just compensation for a taking, the deletion of any reference to multi-unit buildings, and the statements of the congressmen approving and decrying the deletion of section 633 lead ineluctably to the conclusion that Congress made a considered decision that the Cable Act should not give cable operators the right to impose their service on owners of multi-unit dwellings who choose not to use them.[7]
 
 D.
 
 43
 Our holding that the Cable Act does not mandate access by cable companies to multi-unit dwellings avoids the necessity of resolving the parties' dispute over whether access by more than one cable system is technologically feasible. Waterford Associates contends that simultaneous dual use of the same cable wiring is impossible. Cable Investments does not contradict that but contends that it is possible for a cable company and a satellite system to serve the same apartment complex. Waterford Associates responds that if parallel systems were installed there would be too many wires too close together at the point of initial distribution, which could cause interference and resulting diminution of the quality of reception. In light of our construction of the statute, we need not remand for a factual determination on this issue.
 
 
 44
 It appears that cable television can now be provided not only through wired systems such as those operated by cable companies like Cable Investments and private systems using a satellite master antenna like MGM but also by wireless cable systems using different technologies. The Department of Commerce predicts that additional systems are likely to appear in the future. See Department of Commerce Report, app. B at 8-12. In light of the proliferation of systems and the possibility of interference, a legislature enacting a mandatory access provision would have to consider whether to regulate also how selection should be made from among competing systems. Our holding that the statute does not mandate giving the cable company access to the building leaves that selection to the owner of the property. We may assume that selection will be based on the realities of the marketplace and that the wishes of the tenants will not go unheeded since cable television may be one of the services that prospective tenants consider in their selection of a building.
 
 
 45
 Finally, we are guided in no small part by the requirement to interpret a statute when possible to avoid raising constitutional questions. See United States v. Grace, 461 U.S. 171, 175-76, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). Our statutory construction of the Cable Act avoids the constitutional issue that would be created were access mandated without providing for just compensation to be made to the owner.
 
 
 46
 In Loretto, the Supreme Court held that a statute that mandates installation of cable television facilities on private premises constitutes a taking of the property. The Court reaffirmed "the traditional rule that a permanent physical occupation of property is a taking," Loretto, 458 U.S. at 441, 102 S.Ct. at 3179, and noted that the installation of cable television involved attachment of plates, boxes, wires, bolts and screws to the building. Id. at 438, 102 S.Ct. at 3177; see also Kaiser Aetna v. United States, 444 U.S. 164, 180, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) (factor in finding taking was "actual physical invasion of the privately owned [property]").
 
 
 47
 Cable Investments relies on two district court cases as rejecting a challenge based on Loretto to the construction of section 621(a)(2) of the Cable Act as a mandatory access provision. See Greater Worcester Cablevision, Inc. v. Carabetta Enterprises, Inc., 682 F.Supp. 1244, 1258-59 (D.Mass.1985); Cable Holdings, Inc. v. McNeil Real Estate Fund VI, Ltd., 678 F.Supp. 871, 874 (N.D.Ga.1986). However, both cases construe the Cable Act as providing for just compensation for the taking that would be effected if the Cable Act mandated access to the interior of private buildings. We have already explained why we disagree with those district courts' statutory interpretation, since Congress deleted the provisions designed to comply with Loretto. Moreover, in Greater Worcester the court held unconstitutional the Massachusetts statute which did mandate access because it failed to provide for just compensation for landlords for the installation of cable on their property. See 682 F.Supp. at 1252.
 
 
 48
 Cable Investments also suggests that since the wires are already in place, no taking occurs. It concedes, however, that only one signal at a time can go through those lines. Transcript of Oral Argument at 28. A requirement that Waterford Associates must permit Cable Investments to use those lines could be viewed to effect a permanent occupation of Waterford Associates' property[8] which would constitute a taking. See FCC v. Florida Power Corp., 480 U.S. 245, 251, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987) (a critical factor in Loretto was that the statute "specifically required landlords to permit permanent occupation of their property by cable companies"). However, in light of our holding that Congress did not provide for mandatory access to multi-unit dwellings, there was no necessity for Congress to provide for just compensation for the value of the property taken, and hence the absence of any such provision does not raise any constitutional question.
 
 III.
 The Pennsylvania Landlord and Tenant Act
 
 49
 The alternate statutory basis on which Cable Investments relies for its claim for access to Waterford is the Pennsylvania Landlord and Tenant Act. Cable Investments argues that under Pennsylvania law it can follow the utilities' easements to the exterior of the building and that thereafter its access to the interior of each tenant's apartment is mandated under section 250.554 of the Pennsylvania Landlord and Tenant Act or common law.
 
 
 50
 It is true, as noted by Representative Wirth, that a number of states have passed statutes mandating access to multi-unit dwellings. For example, the Massachusetts statute considered in Greater Worcester Cablevision provided that a landlord must permit a cable operator to install its cable television equipment on its property if a tenant has asked for cable service. See 682 F.Supp. at 1247. Indeed, that is precisely why the court held the statute unconstitutional. See id. at 1248-52.
 
 
 51
 The Pennsylvania Landlord and Tenant Act is not analogous. Section 250.554 provides, in pertinent part, that,The tenant shall have a right to invite to his apartment or dwelling unit such employees, business visitors, tradesmen, deliverymen, suppliers of goods and services, and the like as he wishes so long as his obligations as a tenant under this article are observed.... These rights may not be waived by any provisions of a written rental agreement and the landlord and/or owner may not charge any fee, service charge or additional rent to the tenant for exercising his rights under this act.
 
 
 52
 It is the intent of this article to insure that the landlord may in no way restrict the tenant's right to purchase goods, services and the like from a source of the tenant's choosing....
 
 
 53
 68 Pa.Stat.Ann. Sec. 250.554 (Purdon Supp.1988).
 
 
 54
 The Pennsylvania courts have not given this provision the expansive construction Cable Investments desires. In Wilco Electronic Systems, Inc. v. Davis, 375 Pa.Super. 109, 543 A.2d 1202 (1988), the only reported appellate decision on this issue, the Superior Court declined to bring cable television within the reach of section 250.554 and noted the difference between allowing a tenant to purchase "goods, services and the like" and allowing a tenant to force a landlord to permit a cable company to provide service to the tenant. Unlike the former, "[t]he very nature of cable television involves tangible equipment which must be permanently installed and may result in substantial damage to property." Wilco, 543 A.2d at 1209. At least two Courts of Common Pleas had previously reached the same conclusion. See T-C Harrisburg Co. v. Sammons Communications, 107 Dauphin County Rep. 411, 417-18 (1987); Weaver v. Dallmeyer, 101 York Legal Record 110 (1987).
 
 
 55
 The only authority supporting Cable Investments' position, Stephenson v. Diversified Holdings Corp., No. 5144 Equity 1983 (C.P. Berks, Aug. 24, 1983), slip op., aff'd without op., 339 Pa.Super. 626, 488 A.2d 1171 (1984), is of limited value because the issue arose in the context of a preliminary injunction and the court noted that the final resolution of the parties' rights would await trial. Stephenson, slip op., at 3, 6. In any event, the Superior Court's subsequent construction of the statute in Wilco would take precedence.
 
 
 56
 We defer to the Wilco court's reasonable construction of section 250.554. Permitting a tenant to insist that a landlord allow a cable company to install equipment and provide service is an intrusion of a qualitatively different nature than the temporary intrusion effected by tradesmen and business visitors. We also reject summarily Cable Investments' argument that the common law gives tenants such rights, an argument that would have been discussed in Wilco were it viable.
 
 
 57
 Because we hold that Pennsylvania law does not give Cable Investments any rights to the interior of Waterford's buildings, we need not decide the extent to which it can piggyback on the private easements of various utilities up to the exterior of the building under either Pennsylvania law or the Cable Act.
 
 IV.
 
 58
 The First Amendment of the United States Constitution
 
 
 59
 We need spend little time on Cable Investments' argument that Waterford Associates' refusal to grant it access is a violation of the First Amendment of the United States Constitution. Although a municipal ordinance restricting cable franchising raises a cognizable First Amendment claim, see City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 494-95, 106 S.Ct. 2034, 2037-38, 90 L.Ed.2d 480 (1986), in this case Cable Investments complains about Waterford Associates' conduct restricting its access, not the conduct of the state or a municipality. Following an extensive discussion of the applicable precedent, Judge Kosik dismissed this count on the ground that no state action was implicated. 680 F.Supp. at 176-78.
 
 
 60
 Cable Investments, while admitting that Waterford is not a "company town", nonetheless argues that the apartment complexes bear a close enough resemblance to the "company town" in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), that Waterford Associates' exclusion of Cable Investments should be considered state action. Marsh is inapposite. There, a company effectively operated as the municipal government, in that it owned the streets, sidewalks, and business block, paid the sheriff, privately owned and managed the sewage system, and owned the building where the United States post office was located. Id. at 502-03, 66 S.Ct. at 276-77. "[T]he owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State." Lloyd Corp. v. Tanner, 407 U.S. 551, 569, 92 S.Ct. 2219, 2229, 33 L.Ed.2d 131 (1972). Marsh has been construed narrowly. See Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158-59, 98 S.Ct. 1729, 1734-35, 56 L.Ed.2d 185 (1978); Hudgens v. NLRB, 424 U.S. 507, 513-21, 96 S.Ct. 1029, 1033-37, 47 L.Ed.2d 196 (1976); see also Robison v. Canterbury Village, Inc., 848 F.2d 424, 428-31 (3d Cir.1988).
 
 
 61
 Cable Investments has not alleged, and the record does not suggest, that Waterford Associates has become a substitute for a municipal government in any meaningful way. There is no allegation that the two complexes in this case are anything more than apartment buildings with some associated shopping facilities and office space. We agree with the district court that Cable Investments has failed to allege the requisite state action to support its First Amendment claim.
 
 V.
 
 62
 The Free Speech Clause of the Pennsylvania Constitution
 
 
 63
 Finally, Cable Investments argues that Waterford Associates' refusal to permit it access to Waterford is a violation of Article I, Section 7, of the Pennsylvania Constitution. That provision declares that,
 
 
 64
 The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject....
 
 
 65
 Pa. Const. art. I, Sec. 7.
 
 
 66
 Cable Investments argues that this provision has been interpreted and applied more broadly as to state action than has the First Amendment. For support, Cable Investments cites Commonwealth v. Tate, 495 Pa. 158, 432 A.2d 1382 (1981). Although the Court in Tate held that persons distributing political leaflets on the grounds of a private college during a public symposium at which the director of the FBI was speaking were engaging in speech protected under the Pennsylvania Constitution, it did so on the ground that the college had held itself out as a forum open to the public. 495 Pa. at 174-75, 432 A.2d at 1390-91. The Tate opinion was clarified in Western Pa. Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co., 512 Pa. 23, 515 A.2d 1331 (1986) (plurality opinion), where the Court held that a shopping mall could exclude all individuals engaged in political solicitation. Although the theories of the justices comprising the majority differed, all but one of the seven justices agreed that because the shopping mall had not invited the public onto its premises for political purposes, Article I, Section 7, was inapplicable.
 
 
 67
 This case is governed by Western Pennsylvania Socialist Workers rather than Tate. Waterford Associates has not presented Waterford as a public forum for any purpose for which Cable Investments wishes to speak. More importantly, discrimination on the basis of the political content of the speech, a significant factor in Tate, is not present here. Therefore, the district court did not err in dismissing Cable Investments' claim under the Pennsylvania Constitution.
 
 VI.
 Conclusion
 
 68
 In summary, we hold that section 621(a)(2) of the Cable Act does not mandate access by cable companies to multi-unit dwellings for the purpose of providing their services to the tenants. Because we hold that the count of Cable Investments' complaint based on the Cable Act states no cause of action, we need not reach the issue whether a private right of action to enforce the right asserted by Cable Investments can be implied.
 
 
 69
 We also hold, in accordance with a similar holding by the Pennsylvania Superior Court, that the Pennsylvania Landlord and Tenant Act cannot be construed to grant cable companies mandatory access to multi-unit dwellings. In addition, we agree with the district court that Cable Investments' claims under the United States Constitution and the Pennsylvania Constitution state no cause of action.
 
 
 70
 For the foregoing reasons, we will affirm the dismissal of the complaint.
 
 
 
 *
 Hon. Dickinson R. Debevoise, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 There is no question that Cable Investments has suffered the "injury in fact" that satisfies the Article III standing requirement. See Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)
 
 
 [2]
 The FCC has not taken any position on this issue. Its general position that property owners cannot deny cable access "over public rights-of-way and through easements designated for compatible uses," see Implementation of the Provisions of the Cable Communications Policy Act of 1984, 50 Fed.Reg. 18,637, 18,647 (1985), merely duplicates in substance the statutory language. Id
 
 
 [3]
 We note in passing that even those members of Congress who supported the draft of section 633 which would have provided mandatory access were motivated by a concern that tenants of multi-unit dwellings might not have access to cable in the absence of such a provision. See note 7 infra. In this case, however, there is no basis for any such concern because Waterford's tenants do have access to cable television, albeit service provided by a different system
 
 
 [4]
 Subsection (b) of section 633 provided in part as follows:
 (b)(1) A State or franchising authority may, and the [Federal Communications] Commission shall, prescribe regulations which provide--
 (A) that the safety, functioning, and appearance of the premises and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
 (B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both;
 (C) that the owner be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator....
 H.R. No. 4103, 98th Cong., 2d Sess. Sec. 633(b) (1984); reprinted in H.R.Rep. No. 934, 94th Cong., 2d Sess. 13.
 
 
 [5]
 Section 621(a)(2) provides that:
 (2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure--
 (A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
 (B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and
 (C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.
 47 U.S.C. Sec. 541(a)(2)(A)-(C).
 
 
 [6]
 These provisions of section 633 were:
 (d) In prescribing methods under subsection (b)(1)(D) for determining just compensation, consideration shall be given to--
 (1) the extent to which the cable system facilities physically occupy the premises;
 (2) the actual long-term damage which the cable system facilities may cause to the premises;
 (3) the extent to which the cable system facilities would interfere with the normal use and enjoyment of the premises; and
 (4) the enhancement in value of the premises resulting from the availability of services provided over the cable system.
 (e)(1) During any period for which regulations by a State or franchising authority are not otherwise in effect under subsection (b), regulations of the Commission shall apply with respect to the cable system involved.
 H.R. No. 4103, 98th Cong., 2d Sess. Sec. 633 (1984), reprinted in H.R.Rep. No. 934, 98th Cong., 2d Sess. 13.
 
 
 [7]
 Even if Congress had included section 633 in the final version of the bill, Cable Investments still might not gain access to Waterford. Section 633(h)(1) provided that "[t]his section shall not apply to any owner of a multiple unit residential or commercial building or manufactured home park who makes available to residents a diversity of information sources and services equivalent to those offered by the cable system [seeking access]." Id. at Sec. 633(h)(1). MGM's cable television service may be equivalent to that offered by Cable Investments
 
 
 [8]
 Cable Investments concedes that Waterford Associates owns the wiring currently on the Waterford property, even though Cable Investments installed at least some of it