Cyril **BOWMAN**, Plaintiff,

v.

**BANK OF DELAWARE**, Defendant.

**Civ. A. No. 87–44–CMW.**

United States District Court,
D. Delaware.

May 17, 1989.

Leo John Ramunno, Wilmington, Del., for plaintiff.

Sheldon N. Sandler of Young, Conaway, Stargatt & Taylor, and Michael D. Kelsey of Bank of Delaware, Wilmington, Del., for defendant.

OPINION

CALEB M. WRIGHT, Senior District Judge.

In this action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, plaintiff Cyril Bowman ("Bowman") seeks damages against his former employer, defendant Bank of Delaware ("the Bank"), based on alleged national-origin discrimination in connection with his employment and ultimate discharge. A three-day, non-jury trial was held from March 2–6, 1989, and the case is presently before the Court for a decision on the merits. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52(a).

I.  FACTS

Bank of Delaware hired Bowman as a safe deposit clerk on February 14, 1974. PTO-2.[1] Bowman, 66, is of British national origin, and became a United States citizen in 1979. Tr. at A–3–4. In his charge of discrimination filed with the Delaware Department of Labor, Bowman identified his national origin as "Native of India". DX–33.

Bowman remained a safe deposit clerk during his tenure at the Bank, and his duties did not change significantly. Tr. at E–3. As such, his principal duty was to wait on customers in the safe deposit department, a task that included escorting customers to their boxes, setting up new rentals and accepting the surrender of old ones. *Id.* Bowman also had certain clerical responsibilities, such as billing, posting notices, keeping safe deposit journals and advising safe deposit clerks at the other bank branches when they needed assistance. Tr. at A–3–4.

In 1977, the Bank transferred Bowman from one of its branches to the main office

---

1. The following abbreviations will be used in this Opinion when documents relating to the case are cited:
   PTO—Pretrial Order

PX—Plaintiff's Exhibit
DX—Defendant's Exhibit
Tr.—Trial Transcript

at 300 Delaware Avenue in Wilmington. Tr. at A–31. During all relevant times, that office was managed by Vincent Contento ("Contento"). Tr. at B–7. The employees who supervised Bowman at the 300 Delaware Avenue branch were Edward Walker ("Walker"), the assistant branch manager, and April Bedgood ("Bedgood"), the safe deposit group leader. Tr. at B–7, D–2.

Bedgood began working at the 300 Delaware Avenue branch in September of 1980. Tr. at C–62, D–2. One of the reasons the Bank transferred Bedgood to the safe deposit area was her knowledge of computers, which were increasingly used in that department. Tr. at D–4. Bowman testified that he trained Bedgood, and that all of his problems at the Bank began in early 1985, several months after what he recalls to be Bedgood's arrival. Tr. at A–5. However, the evidence indicates that Bedgood arrived at the 300 Delaware Avenue branch in the fall of 1980, and that Bowman's role in training her was merely to familiarize Bedgood with the safe deposit facilities at the branch and to initiate her in the day-to-day operation of the department. Tr. at B–35, C–66.

Bedgood's duties were similar to Bowman's, although she was also responsible for overseeing the safe deposit area, billing customers and acting as a central clearinghouse for safe deposit-related questions from the branch offices. Tr. at C–5, D–3. Prior to Bedgood's arrival at the 300 Delaware Avenue branch, another employee, Naida Gudaitis, performed many of her duties. Tr. at C–6. The job became more complex, though, with the advent of increased computerization. Tr. at D–8.

Prior to the start of his work-related problems in late 1984 or early 1985, Bowman generally received excellent evaluations at the Bank and had few difficulties at work. Tr. at A–4–5, A–31–32; *see also* DX–2 ("very conscientious"), DX–4 ("industrious"), DX–5 ("dependable"). Like other Bank employees, Bowman had interim (six-month) reviews and annual reviews with the supervisory staff. Tr. at E–17. Also, the Bank has a policy of attempting to document any substantial employee complaints and counseling an employee in connection with any problems. *Id.* Department supervisors prepare written performance reviews, which are then reviewed and signed by the employees at the review meetings with supervisors. Tr. at E–18.

Despite Bowman's generally good performance prior to 1985, there were several minor problems in connection with his job. For instance, Bowman was informed on occasion that some customers and fellow employees had difficulty understanding his accented language and his efforts to provide certain information, especially on the phone. He was requested to make an effort to speak more slowly and clearly, and to ensure that the customer or fellow employee understood the message. During Bowman's tenure at the Bank, the volume of complaints in this regard decreased. DX–3; Tr. at E–6–8.

Another criticism was inconsistency in dealing with customers—on some occasions Bowman was friendly and helpful with customers, and at other times he was less than professional. For instance, some customers felt that Bowman did not like them and that he created a "hostile atmosphere". Tr. at D–66–67. Also, supervisors counseled Bowman a number of times about the problem of keeping customers waiting while he spoke on the telephone or carried on conversations with other customers. DX–16; DX–17.

A third area of recurrent difficulty was Bowman's negative reaction to constructive criticism from supervisors. When told of matters that needed correction, Bowman sometimes reacted with anger or denied the existence of problems pointed out to him. Tr. at D–47–49; DX–5; DX–19.

Because his job performance had begun to deteriorate and customer complaints regarding Bowman were increasing, the Bank management made a decision in late 1984 or early 1985 to more thoroughly document any work-related problems Bowman was having. Tr. at D–50–51, C–72–73. This documentation, by memorandum or note, was helpful to the supervisors in preparing Bowman's semi-annual evaluations.

Tr. at C–117, D–11. The Bank's practice of more thoroughly documenting a particular employee's problems was not unusual and was standard policy when the supervisory staff perceived a trend of performance, either positive or negative, developing. Tr. at E–82.

On October 8, 1984, Bowman, after having been informed the previous workday that a customer had complained that Bowman had caused a distraction by talking too much and singing in the vault, voiced a formal complaint to Shirley Faye Smith ("Smith") of the Bank's personnel department about his treatment at the Bank. DX–11; DX–12. Bowman's complaints were numerous, and included charges that he was being excluded from employee meetings and had been instructed not to rent safe deposit boxes to blacks. Tr. at E–34. Within several days after Bowman's complaint, Smith met with Contento and Bowman in regard to the allegations. Tr. at E–35. Contento responded to all of Bowman's allegations and stated that he was willing to pursue the problems with the appropriate individuals. Tr. at E–38. However, Bowman thereafter decided not to pursue the matter, and he dropped the allegations. Tr. at E–35.

In early December, 1985, Bowman raised many of the same allegations. Tr. at E–45. Again, his complaint followed closely after a reprimand. DX–22. Bowman stated that he was being discriminated against and harassed by the managers at the 300 Delaware Avenue office and that he wanted a transfer to another branch. Tr. at E–51; DX–23. In connection with Bowman's December complaint, Smith and her supervisor in the personnel department, Dorothy White ("White"), conducted an investigation as to each allegation and wrote a report summarizing their findings. Tr. at E–50; DX–23. After completing their investigation, Smith and White met with Bowman to discuss their findings. Tr. at E–62. In sum, the personnel department found that the facts did not support Bowman's claims of harassment and/or discrimination. DX–23. The meeting concluded with Bowman stating that he understood the basis for the conclusions. Tr. at E–62.

Bowman's allegations of discrimination that form the basis for this lawsuit are rather scattershot, and the December 9, 1985, memorandum from Smith and White to Bowman is a useful means of summarizing Bowman's numerous complaints.[2] *See* DX–23. As to each of these allegations, the only evidence supporting Bowman's charges of discrimination is his own testimony. There is no corroboration by way of documents or the testimony of other witnesses. Indeed, the weight of the evidence supports the finding of Smith and White that there was no discrimination by the Bank against Bowman based on his national origin.

■ Bowman claims that Walker and Bedgood instructed him not to rent safe deposit boxes to black customers. Tr. at A–8. Except for Bowman's statement, there is no evidence that these directives were ever given. The claim is unsupported by any other witnesses or documents, and there is no record of any customers complaining about inability to rent safe deposit boxes. DX–23; Tr. at C–117, D–12.

■ Another of Bowman's complaints to the personnel department was that he was not being given information about other positions available within the Bank. DX–23. The Bank has a procedure, referred to as the career opportunities program, whereby job posting notices are passed around on a weekly basis to each staff member, read and initialed. *Id.;* Tr. at E–76. Additionally, there is a phone line available to Bank employees who wish to call the personnel department to inquire about job postings. Tr. at C–33, E–87.

While there is evidence that some of the circulating job posting notices may have missed Bowman, there is no evidence that this omission was recurrent or intentional, or that it was based on Bowman's national origin. Indeed, the evidence shows that,

---

**2.** Significantly, many of the allegations addressed in the December 9, 1985, memorandum to Bowman parallel the issues of fact alleged by plaintiff in the pretrial order. DX–23; PTO–3–4.

once Bowman complained about not seeing the notices, the managers made sure that future notices did reach him. DX–23. As to Bowman's charge that he was denied a transfer, Tr. at A–10, there is no evidence that Bowman ever formally applied for any of the open positions available through the Bank's career opportunities program. *See* Tr. at E–76, E–87.

■ Another form of harassment or discrimination alleged by Bowman is that he was excluded from certain staff meetings. DX–23. Bowman mistakenly believed he was entitled to attend all such meetings. However, certain meetings involved only management, or other areas of bank operation not relevant to Bowman's job as a safe deposit clerk. *Id.* The evidence does show that the Bank excluded Bowman from some general meetings of branch personnel held during working hours because someone had to "watch the store." Tr. at D–41–42, E–58. There is no evidence, though, that Bowman was excluded any more than other similarly situated employees, or that the occasional exclusion was due to his national origin.

■ Bowman's next allegation of discrimination is that he was treated differently than other employees in connection with a training seminar. Tr. at A–25. In March, 1985, several Bank employees attended a seminar at the Federal Reserve Bank in Philadelphia. Tr. at B–22. Although the seminar was designed for Bank personnel who dealt with Series E bonds, Bowman, who in his capacity as a safe deposit clerk did not work directly with bonds, chose to attend as well. Tr. at B–23. The Bank did not request that Bowman attend, but it did pay his registration fee. Tr. at B–25, C–30. Unlike the other employees who attended the seminar, Bowman was not paid for the day out of the office. *Id.* The Court finds that this did not constitute discrimination because the seminar did not relate to Bowman's job responsibilities. *See* Tr. at C–30.

■ Yet another complaint voiced by Bowman is that the Bank denied him access to his personnel file. Tr. at A–15–16. Once again, except for Bowman's own tes-timony, this allegation is without support in the record. The Bank maintains its official employee files in the personnel department, and the files there are available to employees. Tr. at B–21. The evidence does show that Contento may have refused to allow Bowman access to Contento's personal file on Bowman, a file distinct from the open file in the personnel department, but that Contento referred Bowman to the personnel department. Tr. at B–21–22, C–32. This was standard procedure as far as Contento was concerned, and was not discriminatory as to Bowman. Tr. at C–32.

■ Bowman also claims that he was required to perform custodial work not demanded of other Bank employees. Tr. at A–7–8. The evidence, though, does not support this allegation. Bowman's job description included "light housekeeping", a duty that encompasses changing pens, filling brochure racks and picking up scraps of paper in the lobby. Tr. at C–113, E–115. Other employees, including the branch manager, are also expected to help keep the lobby area clean. Tr. at B–36, C–113.

On November 10, 1985, Bowman was injured in an automobile accident, which necessitated his wearing a neck brace for some time. Tr. at A–17. Bowman testified that Walker told him not to wear the brace at work. *Id.* However, the weight of the evidence is to the contrary, and Bowman apparently wore the brace at work without interference from the Bank. Tr. at C–112, E–15.

After the accident, Bowman spent considerable time at the Bank on the telephone talking to his insurance agent and others about the accident. He also described the accident in great detail to some customers. DX–22; Tr. at D–88, E–15–16. In a memorandum to Bowman on December 4, 1985, Walker stated that the Bank would place Bowman on probation if Bowman continued to make personal phone calls during working hours or to discuss his personal problems with bank customers. DX–22. Bowman signed the memorandum in protest, stating: "[A]ll of this is quite untrue, and I sign this in protest." *Id.*

In early January, 1986, the Bank received an unsolicited letter from a customer, William Franta, in which Franta praised Bowman's job performance. DX–26. Franta stated in the letter that he wrote at the request of Bowman. *Id.* Effective January 15, 1986, the Bank, by way of a memorandum from Contento to Bowman, placed Bowman on probation for insubordination in connection with Bowman's violating the directive that he not discuss his personal problems with customers. DX–28.

Two days later, Bowman left work during the day because of illness. DX–29; DX–30. Pursuant to his doctor's advice, Bowman remained out of work at all relevant times thereafter. DX–30; Tr. at D–23–24. For some time after the accident, Bowman continued to suffer pain and inability to use his left arm. DX–30.

On two occasions in early February, 1986, another customer, Samuel Groundland, complained in-person to Contento that Bowman had twice called Groundland during the evening at home to complain about his personal problems at the Bank and to criticize Contento and Bedgood. DX–31; DX–32. Groundland was a regular customer of the Bank, and Bowman believed that Groundland was friendly with Contento and Walker. Tr. at A–61. In a memorandum to the personnel department describing the first Groundland incident, Contento recommended that "strong consideration be given" to Bowman's termination. DX–31.

Contento and the personnel department thereafter made a joint decision to terminate Bowman for insubordination. Tr. at C–27, E–74. On February 11, 1989, Smith and Contento attempted to arrange a meeting with Bowman, who remained out of work due to illness. Tr. at E–68, E–90. Smith called Bowman at home and asked him to come to the Bank to discuss the second Groundland complaint. Tr. at E–90. Bowman refused, stating that he had been instructed by his attorney not to talk to the Bank, and that in any event he was too ill. Tr. at E–90. Smith asked that Bowman contact her the next day, February 12, to arrange a meeting. *Id.* When Bowman failed to call back, Smith arranged a meeting on February 13 with Contento. *Id.* Contento placed a call to Bowman and again asked Bowman if he would come to the Bank to meet with the managers. *Id.* When Bowman refused, Smith took the phone and advised him that his employment was terminated. *Id.*

At the time of his termination, Bowman's annual salary at the Bank was $11,843. Tr. at E–93. He was receiving the following standard benefits as a Bank employee: medical, dental, vacation, pension, profit sharing, tuition refund, reduced interest rate on loans and credit cards, free checking and a reduced rate on his automobile insurance. Tr. at E–96–97. Upon reaching the age of 65, Bowman contacted the Bank to arrange for the payment of his pension. Tr. at E–93.

Bowman subsequently filed with the Delaware Department of Labor, Anti-Discrimination Section, a charge of discrimination against the Bank on the basis of age and national origin. After an investigation, the agency determined that there was no probable cause to believe that discrimination had occurred. DX–33. The United States Equal Employment Opportunity Commission endorsed that determination. DX–34. The present action does not include a claim of age discrimination.

## II. ANALYSIS

■ Title VII makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). The term "national origin" refers to an individual's place of birth or the place of birth of an individual's ancestors. *Espinoza v. Farah Manuf. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed. 2d 287 (1973).

In examining whether an employer has unlawfully discriminated against an employee based on his or her national origin, courts follow the disparate-treatment analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined by *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This framework was summarized by the *Burdine* court as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. at 252–53, 101 S.Ct. at 1092 (citations omitted). *See also Jalil v. Avdel Corp.,* 867 F.2d 163, 166 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987).

■ "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The plaintiff may satisfy this ultimate burden of proving discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jalil,* 867 F.2d at

166 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Circumstantial evidence may suffice to challenge the defendant's alleged reasons as pretextual. 867 F.2d at 166.

The United States Supreme Court recently altered the evidentiary framework of *McDonnell Douglas* and *Burdine* for a closely defined set of cases. *See Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). A plurality of the Court created a new set of rules for the mixed-motive Title VII case, in which the plaintiff proves that an employment decision resulted from a mixture of legitimate and illegitimate motives. *Id.* at ——, 109 S.Ct. at 1778–80. Such a mixed-motive case is to be distinguished from the *Burdine*-like pretext case, in which the plaintiff attempts to prove that the employer's proffered explanation is itself false. *Id.* —— U.S. at —— n. 12, 109 S.Ct. at 1789 n. 12. As to the pretext case, the analysis remains essentially the same after *Price Waterhouse.* However, in the mixed-motive case, the *Price Waterhouse* court held that, when a plaintiff proves that the prohibited criterion (race, color, religion, sex or national origin) played a "motivating part" in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the forbidden characteristic into account. —— U.S. at ——, 109 S.Ct. at 1795–96.

■ *Price Waterhouse* thus requires that the District Court make a threshold determination whether a particular case involves mixed motives.[3] *Id.* at —— n. 12, 109 S.Ct. at 1789 n. 12. In the present litigation, Bowman has failed to satisfy the Court initially that it is more likely than not that national origin played a part in the Bank's employment decision. *See id.* In other words, this is *not* a mixed-motive case. Therefore, Bowman may only pre-

---

**3.** If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then the case does not present mixed motives and the *Burdine* pretext analysis applies. *See Price Waterhouse,* —— U.S. at ——, 109 S.Ct. at 1789 n. 12.

vail if he has proved, following *Burdine*, that the Bank's stated reason for its treatment of Bowman is pretextual. *See id.* at —— n. 12, 109 S.Ct. at 1789 n. 12.

To establish a prima facie case of national origin discrimination, a plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the job; and (3) he was discharged while other employees not in his protected class were retained. *Jalil*, 867 F.2d at 167. However, a preliminary determination that the plaintiff has proven a prima facie case need not be made here, because the case has been fully tried on the merits.[4] *See Desai v. Tompkins County Trust Co.*, 34 FEP Cases 938, 941 (N.D.N.Y.), *aff'd*, 794 F.2d 676 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Smart v. Columbia Gas Sys. Service Corp.*, 38 FEP Cases 1429, 1431 (D.Del. 1985). Whether Bowman has proved his prima facie case is thus no longer relevant, and the Court's task is to decide whether the Bank intentionally discriminated against Bowman. *Id.* (citing *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983)).

Bowman has alleged that he was harassed at work, was not promoted and was ultimately fired, all because of discrimination due to his national origin. The inquiry on each of these claims is similar, and begins with the question of whether the Bank has shown a legitimate, non-discriminatory reason for its actions. The Court finds that the Bank has carried this burden. Bowman increasingly exhibited serious shortcomings in performance and attitude. His garrulous nature began to interfere with his job performance, and his supervisors explicitly warned him that he would be placed on probation if his personal phone calls and lengthy conversations with customers continued.

The inference of discrimination arising out of the prima facie case dissolves when the employer shows a legitimate, nondis-criminatory reason for the conduct. *Mousavi v. Beebe Hospital*, 674 F.Supp. 145, 152–53 (D.Del.1987) (citing *Smithers v. Bailar*, 629 F.2d 892, 895 (3d Cir.1980)). Bowman must therefore reshoulder the burden of proving intentional discrimination, either directly by persuading the Court that national origin more likely motivated the Bank or indirectly by showing that the Bank's proferred reasons are unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. He must do so by a preponderance of the evidence. *See id.* at 250, 101 S.Ct. at 1092. Bowman cannot prevail by relying merely on the elements of his prima facie case. *Mousavi*, 674 F.Supp. at 153. However, the *McDonnell Douglas–Burdine* formula does not compartmentalize the evidence so as to limit its use to only one phase of the case. *Jalil*, 867 F.2d at 168 n. 3. A plaintiff's evidence may serve both to establish a prima facie case and to discredit a defendant's explanation. *Id.*

The evidence adduced at trial shows that Bowman, an overly sensitive but well-intentioned employee, had increasing difficulty getting along with Walker and Bedgood, and that customer complaints regarding Bowman's job performance were on the rise. As was the situation in *Jalil*, plaintiff's evidence here "lacks the necessary mortar with which to build a case of national origin discrimination." *See* 867 F.2d at 167. Bowman's evidence consists only of a litany of his own unsubstantiated complaints. Not one witness called by Bowman could corroborate his claims of discrimination.

The Bank placed Bowman on probation not because of his national origin but because of his discussion of his personal affairs and job complaints with customers. He violated the clear terms of his probation by calling a customer at home and complaining about his problems at the Bank. This resulted in his firing by the Bank, and there is no evidence that national origin played any role in that decision.

---

**4.** Additionally, the Bank does not really dispute that Bowman was a member of a protected class, was qualified for his job as a safe deposit clerk and was discharged while other employees not in his protected class were retained.

## III. CONCLUSION

For the foregoing reasons, the Court finds that plaintiff, Cyril Bowman, has failed to meet his burden of persuasion under Title VII that he was discriminated against by defendant, Bank of Delaware, on the basis of his national origin. Judgment is therefore granted in favor of defendant.

The Court will enter an Order in accordance with this Opinion.