991 F.2d 1169
 61 USLW 2622
 MEDIA GENERAL CABLE OF FAIRFAX, INC., Plaintiff-Appellant,
v.
SEQUOYAH CONDOMINIUM COUNCIL OF CO-OWNERS; AMSAT
Communication, Incorporated, Defendants-Appellees.
Comcast Cable Communications; Adelphia Communications;
Tele-Communications, Incorporated; Storer Cable
Communications, Incorporated, Amici Curiae.
 No. 90-2399.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1991.
Decided March 29, 1993.
 
 Robert Harvey Chappell, Jr., Christian, Barton, Epps, Brent & Chappell, Richmond, VA, argued (David C. Kohler, E. Ford Stephens, on brief), for plaintiff-appellant.
 W. James MacNaughton, Short Hills, NJ, argued (Robert Rowan, Nixon & Vanderhye, Frank W. Dunham, Jr., Cohen, Gettings, Alper & Dunham, Arlington, VA, William H. Hefty, Richmond, VA, on brief), for defendants-appellees.
 Terry S. Bienstock, Frates, Bienstock & Sheehe, Miami, FL, for amici curiae.
 Before ERVIN, Chief Judge, STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Media General Cable of Fairfax, Inc. (Media) a cable television franchisee, brought this declaratory action under § 621(a)(2) of the Cable Communications Policy Act of 1984 ("the Cable Act")[1] seeking a declaration that it was entitled to install its cable wires in compatible easements on the Sequoyah Condominium's (Sequoyah) commons area. The district court held that the Act did not (1) permit Media to compel access to private utility easements in order to reach individual unit owners at Sequoyah and (2) authorize a taking of this private property, nor provide just compensation for such a taking.[2] Media appeals and we affirm.
 
 I.
 
 2
 In September 1982 Media was granted a nonexclusive franchise by Fairfax County, Virginia to operate a cable television system. In November 1988, Media allegedly was asked by certain residents of Sequoyah Condominium to provide cable service within the condominium complex, located in Fairfax County and comprising more than 1000 individual townhouse and other residential units. Sequoyah's Council of Co-Owners, (Sequoyah), is an unincorporated association to which all of its residential owners belong and is responsible for the governance and management of the complex.
 
 
 3
 AMSAT Communication, Incorporated, (AMSAT) by way of permissive intervention[3], operates a satellite master antenna television system. AMSAT does not hold any local franchise of the type held by Media, but rather operates through the use of satellite and master antenna facilities located on private property within a residential complex, by agreement with such complex, and distributes the signals so received to residents through wires located within the complex. In 1982, a predecessor of AMSAT entered into an exclusive agreement with Sequoyah to provide cable television service.
 
 
 4
 The Master Deed of the Sequoyah complex dated September 14, 1972 provides for--
 
 
 5
 a blanket easement upon, across, over and under all of the property for ingress, egress, installation, replacing, repairing, and maintaining a master television antenna system and all utilities including, but not limited to, water, sewers, telephones and electricity. By virtue of this easement, it shall be expressly permissible for the providing utility company to erect and maintain the necessary poles and other necessary equipment on said property and to affix and maintain utility wires, circuits and conduits on, above, across and under the roofs and exterior walls of the residents [.] [sic] [N]otwithstanding anything to the contrary contained in this paragraph, no sewers, electrical lines, water lines, or other utilities may be installed or relocated on said property except as initially programmed and approved by the Declarant, or thereafter approved by the Declarant, or thereafter approved by the Council. Should any utility furnishing a service covered by the general easement herein provided request a specific easement by separate recordable document, the Declarant or Council shall have the right to grant such easement on said property without conflicting with the terms hereof.
 
 
 6
 In accordance with the last sentence of that blanket easement, Sequoyah granted specific utility easements in favor of Virginia Power and Electric Company (Virginia Power), Chesapeake and Potomac Telephone Company (C & P), and AMSAT. All of those grants antedate the Act. The Master Deed grant is seemingly in perpetuity, as are, for practical purposes, the grants in favor of Virginia Power and C & P. On the other hand, the grant in favor of the predecessor of AMSAT is specifically limited to the duration of the agreement between AMSAT and Sequoyah. The initial term of that agreement expired on March 15, 1990. However, the agreement provides for automatic renewal for three successive four-year terms unless either party gives notice to the contrary. Apparently, the first four-year renewal is presently in effect. The grant in favor of AMSAT is exclusive with regard to cable television.
 
 
 7
 In 1989, pursuant to the Cable Act, Media requested Sequoyah to allow Media to place Media's lines in the common areas of the Sequoyah complex through master and other easements described supra. Sequoyah, citing to the exclusivity provision in its contract with AMSAT, refused so to do, despite the alleged desires of a majority of Sequoyah's residents to have Media provide such service. Thereafter, Media instituted this action, seeking declaratory and equitable relief to require Sequoyah pursuant to the Cable Act to permit Media to provide cable service to those residents who desire it.
 
 
 8
 The district court refused to grant such relief, holding that the right of access provided by section 621(a)(2) of the Cable Act is limited to easements which have been dedicated for public use and holding that none of the easements granted to Virginia Power, C & P or AMSAT or in the Master Deed are easements dedicated for public use. Upon Media's within appeal, we affirm the decision of the district court.
 
 II.
 
 9
 After this case was instituted by Media, AMSAT moved to intervene. While the district court determined that AMSAT was not entitled to intervene as a matter of right under Federal Civil Rule 24(a)(2), it did grant permissive intervention under Federal Civil Rule 24(b)(2). No party questions, in this appeal, the district court's intervention rulings.
 
 III.
 
 10
 The district court also ruled that section 621(a)(2) of the Act creates an implied private right of action in favor of a cable operator seeking access to compatible easements within its franchise area, largely relying upon Centel Cable Television Co. v. Admiral's Cove Associates, Ltd., 835 F.2d 1359 (11th Cir.1988). In Admiral's Cove, Judge Fay applied the four-step test set forth in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). The court below similarly applied that Cort v. Ash test and, like the Eleventh Circuit in Admiral's Cove, held that the Cable Act created a private cause of action. We agree.
 
 
 11
 Section 621(a)(2) of the Cable Act provides as follows:
 
 
 12
 (2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure--
 
 
 13
 (A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
 
 
 14
 (B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and
 
 
 15
 (C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.
 
 
 16
 In Cort v. Ash, Justice Brennan set forth the following four-step inquiry concerning whether a federal statute creates an implied private cause of action:
 
 
 17
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 18
 Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted; emphasis in original).
 
 
 19
 There is little question but that Media is within the class of persons for whose benefit the Cable Act was enacted.[4] Nor is there any question that the cause of action Media asserts in this case is not one regulated normally by state law. Further, the legislative history indicates that Congress intended section 621 to enable operators of cable television systems to "piggy back" upon easements "dedicated for electric, gas or other utilities." H.R.Rep. 934, 98th Congress, 2d Sess. 59, reprinted in 1984 U.S.C.C.A.N. 4655, 4696. Accordingly, this action passes muster under the Cort v. Ash standards.[5]
 
 IV.
 
 20
 The court below, in its second opinion, concluded that the only compatible easements covered by section 621(a)(2) of the Cable Act are those dedicated for a public use.
 
 
 21
 There is no dispute that the four existing easements at Sequoyah are private easements, rather than public rights-of-way or dedicated easements. The district court, believing that the placement of Media's cables along a private easement would constitute a compensable taking, then addressed the issue of whether the Act authorized such a taking, and concluded that it did not.
 
 
 22
 While the district court devoted considerable attention to questions of the takings and just compensation under the Fifth Amendment, in my view, Judge (now Chief Judge) Sloviter of the Third Circuit was right in suggesting that it is more orderly to begin by deciding whether the statute gives a cable franchisee a substantive right of access to multi-unit dwellings. Cable Invs., Inc. v. Woolley, 867 F.2d 151, 154 (3d Cir.1989).
 
 
 23
 Therefore, we will adopt the Cable Invs. approach by beginning our analysis of the issue by examining the key language of section 621(a)(2). It reads, in part:
 
 
 24
 (2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is (sic) within the area to be served by the cable system and which have been dedicated for compatible uses....
 
 
 25
 47 U.S.C. § 541(a)(2) (1991).
 
 
 26
 To our mind, the plain language of section 621(a)(2) shows that Congress intended to do no more than to authorize a franchisee (such as Media) to use public lands, namely public rights-of-way and easements that have been dedicated to public use.
 
 
 27
 The first ground supporting this conclusion stems from basic principles of statutory construction. Media is asking us to single out the word "dedicate" as used in section 621(a)(2) and give it special meaning. We are also requested to use the layperson's definition of "dedicated," which would in essence be the same as "designated." Under Media's interpretation, any easement that has been designated or reserved for a utility's use would meet the definition of being dedicated. Black's Law Dictionary, however, defines "dedicate" as follows:
 
 
 28
 To appropriate and set apart one's private property to some public use; as to make a private way public by acts evincing an intention to do so.
 
 
 29
 Black's Law Dictionary, 412 (6th ed. 1990).
 
 
 30
 The same dictionary further defines "dedication" as follows:
 
 
 31
 The appropriation of land, or an easement therein, by the owner, for the use of the public, and accepted for such use by or on behalf of the public.... A deliberate appropriation of land by its owner for any general and public uses, reserving to himself no other rights than such as are compatible with the full exercise and enjoyment of the public uses to which the property has been devoted.
 
 
 32
 Id.
 
 
 33
 Thus, the word "dedicated" has a more restricted and legally significant definition in the property-law context than in the layman's vocabulary. It is generally accepted that where Congress uses technical words, or terms of art, those words are to be construed by reference to the art or science involved. Corning Glass Works v. Brennan, 417 U.S. 188, 201, 94 S.Ct. 2223, 2231, 41 L.Ed.2d 1 (1974); Greenleaf v. Goodrich, 101 U.S. 278, 284, 25 L.Ed. 845 (1880). Since "dedicated" is a term of art with reference to property matters, we should use that definition in preference to the ordinary definition found in Webster's.
 
 
 34
 Moreover, if we adopted Media's proffered definition of "dedicated," we would be reading the word in a vacuum. Yet the "dedicated" we seek to interpret here is found not in a vacuum, but rather in the midst of a statute. We therefore must read it in the context of that statute. Section 621(a)(2) provides that a cable system is authorized "over public rights-of-way, and through easements, which ... have been dedicated for compatible uses...." 47 U.S.C. § 541(a)(2) (1988) (emphasis added). Construing these clauses together, it would be more consistent to define "dedicated" according to its property-related definition, which requires, inter alia, that the easement be public, than to define "dedicated" to include private easements when the rights-of-way are required to be public.
 
 
 35
 Media suggests that the definition of "dedicated" should not be limited to a technical, common-law property sense, and that the Federal Communications Commission's reading of the word in another context as synonymous with "designated" or "granted" should be given considerable weight. With all respect, we disagree.
 
 
 36
 All of the above considerations support the district court's conclusion that section 621(a)(2) does not allow cable companies to force landlords or property owners' associations to allow cable companies to use easements on their private property. They support the grounds carefully laid out by the district court in its well-reasoned opinion.
 
 
 37
 Finally, we do not believe that we can ignore the precise words of Congress in favor of trying to discern and follow a rule that would promote some ill-defined goal of "national uniformity."
 
 
 38
 While we believe that the express wording of section 621(a)(2) is sufficient to support the district court's decision alone, we also find the Cable Act's legislative history persuasive, especially Congress's failure to enact section 633. Section 633, which Congress deleted from the Cable Act, would have given mandatory access for a cable franchisee to serve "the owner of a unit within a condominium apartment building or other residential complex" despite the objection of the owner of the surrounding common areas. See H.R.Rep. No. 934, 98th Cong.2d Sess. 90 reprinted in 1984 U.S.C.C.A.N. 4655, 4717. For an illuminating discussion of the legislative history of the Cable Act, see Cable Invs., Inc. v. Woolley, 867 F.2d 151, 155-159 (3d Cir.1989).
 
 
 39
 Another interesting point not raised by the parties is that the broad congressional purpose of the Cable Act was written before the final passage of the Act. It was part of the original bill which contained § 633.
 
 
 40
 Careful study of the House Bill as originally proposed and an understanding of the innerworkings of the statute make it clear that Congress was trying to achieve two different things in the two different sections. Section 633 directly addressed the issue before us today: whether property owners' associations or apartment landlords may prevent the cable company from coming onto their private property to provide cable service to others.[6] The focus in § 633 was on the rights of individuals in single residential units to be able to receive cable. Section 621, on the other hand appears to give franchise holders the ability to make use of public rights of way and easements which are being used by similar utilities such as telephone companies and power companies. The emphasis on the "private" in section 633 and "public" in section 621 corresponds to the different purposes of each section. Since § 633 did not pass, we do not believe that we should confuse the different purposes and allow cable companies to sneak in under § 621(a)(2) for protection. Congress could have passed section 633. It chose not to. We agree with the words of the Third Circuit:
 
 
 41
 What is significant for our purposes is that section 633 was dropped from the bill that was passed by Congress. The fact that section 633 was not part of the Act as it ultimately emerged from Congress is a strong indication that Congress did not intend that cable companies could compel the owner of a multi-unit dwelling to permit them to use the owner's private property to provide cable service to apartment dwellers. See Russello v. United States, 464 U.S. 16, 23-24 [104 S.Ct. 296, 301, 78 L.Ed.2d 17] (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").
 
 
 42
 Cable Invs. Inc. v. Woolley, 867 F.2d 151, 156 (3d Cir.1989).
 
 
 43
 Thus, to the extent that the legislative history and the Cable Act's stated purpose indicate that Congress wanted to allow forced takings of private easements, those normal guides to legislative intent are substantially weakened in light of the deletion of section 633.
 
 
 44
 After examining the case law in the area, in addition to the Third Circuit's opinion in Cable Investments, discussed above, we embrace the result (if not all of the reasoning) reached by the Eleventh Circuit in Cable Holdings of Ga., Inc. v. McNeil Real Estate, 953 F.2d 600 reh'g en banc denied, 988 F.2d 1071 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992) a case factually on all fours with this case. The Cable Holdings court began by recognizing that it had a duty to "avoid any interpretation of a federal statute which raises serious constitutional problems or results in an unconstitutional construction." Id. at 604 (citing Frisby v. Schultz, 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988)). It went on to state that
 
 
 45
 If Section 621(a)(2) authorized Smyrna Cable (the cable franchisee) to construct its cable system on McNeil's private property regardless of the presence of any compatible easements, we would have little difficulty in finding the provision in violation of the Fifth Amendment. After all, under such facts section 621(a)(2) would be indistinguishable from the New York statute analyzed (and declared unconstitutional) in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).
 
 
 46
 In Cable Holdings, the court went on to opine that section 621(a)(2) is capable of being interpreted in such a way as to avoid what it described as "substantial constitutional difficulties." Cable Holdings, 953 F.2d at 602. It found that "Congress did not intend section 621(a)(2) to reach wholly private easements so that franchised cable companies could access the interiors of private apartment buildings." Id at 606. This construction was believed to be consistent with the Eleventh Circuit's earlier decisions in Centel Cable Television Co. v. Admiral's Cove Assocs., 835 F.2d 1359 (11th Cir.1988), and Centel Cable Television Co. v. Thos. J. White Devo. Corp., 902 F.2d 905 (11th Cir.1990), and avoided the constitutional problems raised by the broader interpretation.
 
 By way of summary, the court held:
 
 47
 [W]e have concluded that [s]ection 621(a)(2) provides a franchised cable company with the right to access only those easements which have been dedicated for general utility use, whether by plat recordation for a residential subdivision or otherwise. The alleged easements existing on McNeil's property have not been dedicated by McNeil for general utility use. Rather, these easements were privately granted by McNeil in order to allow limited rights of access to particular entities. Therefore, under section 621(a)(2) of the Cable Act, Smyrna Cable has no right to forcibly access and occupy those easements."
 
 
 48
 Cable Holdings, 953 F.2d at 610.
 
 
 49
 We recognize the validity of the fear that a broader reading of section 621(a)(2) could raise serious constitutional questions.
 
 
 50
 While this is a difficult case we prefer to resolve the statutory interpretation issue as the district court did. For that reason, we would affirm the district court's holding that the Act did no more than to authorize a franchisee to use public lands, namely, public rights of way and easements that have been dedicated to public use. Since our solution does not necessitate a determination of the takings question, we would leave that thorny issue for another day and a different set of facts.
 
 V.
 
 51
 For the reasons set forth above, the decision of the district court that § 621(a)(2) of that Cable Act is limited to easements which have been dedicated for a public use is
 
 
 52
 AFFIRMED.
 
 
 53
 KAUFMAN, Senior District Judge, concurring in part and dissenting in part:
 
 
 54
 I concur in Parts I, II and III of the majority opinion, but respectfully dissent as to Parts IV and V thereof.
 
 A.
 
 55
 The majority concludes that the only compatible easements covered by section 621(a)(2) of the Cable Act are those dedicated for a public use. While that conclusion has also been recently reached by the Eleventh Circuit, see Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund, 953 F.2d 600, 608-09 & n. 9 (11th Cir.), reh'g en banc denied, 988 F.2d 1071 No. 91-8032, (11th Cir., Apr. 9, 1992), cert. denied, --- U.S. ----, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992), I respectfully disagree with it.[1] It is true that section 621(a)(2) limits access to "public rights of way." However, the word "public" does not appear in section 621(a)(2) in relation to the word "easements" or within the phrase "dedicated for compatible uses." Nor does the use of the word "dedicated" indicate that Congress intended that word to apply only in a technical, common-law property sense. That word apparently was used by Congress synonymously with the word "designated" or "granted."[2] See 50 Fed.Reg. 18647 (1985) (Federal Communications Commission (FCC) interpretation). Since the statute itself imposes duties on the FCC, its reading of the statute is entitled to considerable weight. See, e.g., FCC v. WNCN Listeners Guild, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....") (quoting Red Lion Broadcasting v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)). Therefore, I would hold that the word "easements" in section 621(a)(2) is not limited to "public easements," and that that section covers easements of the type granted to Virginia Power, C & P and AMSAT and in the Master Deed.
 
 
 56
 The question remains, however, as to whether the use which Media desires to make of one or more or all of those easements is compatible use.[3] The Master Deed blanket easement came into being at the time that Sequoyah itself came into being, and covers "a master television antenna system and all utilities including, but not limited to, water, sewers, telephones and electricity." (Emphasis supplied). The Virginia Power easement refers specifically to "telephone, television and other communication purposes." (Emphasis supplied). The telephone company easement uses the words "a communication system consisting of buried cables, buried wires...." The AMSAT easement is specifically for cable television purposes and seemingly relates to the installation of equipment similar to that contemplated by Media. Accordingly, the use Media desires would appear to be compatible with those easements.
 
 B.
 
 57
 The court below was very concerned--and in my view, rightfully so--with the question of whether or not section 621(a)(2), if utilized by Media in the way which Media seeks in this case, constitutes a taking of property requiring payment by the provisions of the Fifth Amendment. The district court--and the majority of this Court--have concluded that that issue can be avoided by construing section 621(a)(2) so as not to encompass private easements. However, compensation must be paid for any public taking, whether or not a private user is benefitted.[4] Also, in any event, for reasons discussed infra, I am of the view that the takings issue cannot be sidestepped in this case.
 
 
 58
 The question of whether or not section 621(a)(2) encompasses a constitutional taking is a very difficult one. The Fifth Amendment provides:
 
 
 59
 No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.
 
 
 60
 U.S. Const. amend. V.
 
 
 61
 In Admiral's Cove, Judge Fay wrote as follows:
 
 
 62
 Admiral's Cove assumes that Congress could not authorize a cable franchise to use utility easements because such an authorization would be an unconstitutional taking under Loretto.... Since most developers voluntarily grant easements for use by utilities, however, Congress may force the developer to allow a cable franchise to use the easement without offending the taking clause of the Constitution. Such "voluntary" action by developers may be an integral part of zoning procedures or the obtaining of necessary building permits. However obtained, once an easement is established for utilities it is well within the authority of Congress to include cable television as a user.
 
 
 63
 Admiral's Cove, 835 F.2d at 1363 n. 7 (citations omitted).
 
 
 64
 In Centel Cable Television Co. v. White Development Corp., 902 F.2d 905, 909-10 (11th Cir.1990), Judge Johnson, relying upon Admiral's Cove, rejected the contention that the Cable Act, as interpreted by Admiral's Cove to cover private as well as public easements, violates the Takings Clause of the Fifth Amendment. However, in a concurring opinion in White, Judge Henley, a senior circuit judge of the Eight Circuit, sitting in White by designation, "express[ed] concern over the Admiral's Cove treatment of the takings issue," White, 902 F.2d at 911, and wrote as follows:
 
 
 65
 If the developer in this case had already granted the utility easements when the Cable Act was enacted, then the situation here might be strikingly similar to that present in Loretto. Having already granted the utility easements, the developer would have no power to prevent the installation of cable lines on its property. This situation would be analogous to the facts in Loretto, in which the landlords, having built and rented out apartment buildings, had no practical means to prevent the installation of cable equipment on those buildings.
 
 
 66
 Here, however, the developer had not granted any utility easements when the Cable Act became law. Thus, the Act could be construed not as requiring the developer's acquiescence in the installation of cable equipment, as was the case in Loretto, but rather as merely placing a condition on the developer's future development of his property.
 
 
 67
 ....
 
 
 68
 It would require a more extensive analysis of the Supreme Court's takings jurisprudence than that present here to resolve the complex issue present in this case. Needless to say, I do not think that Admiral's Cove adequately addressed the takings concerns in the one footnote that it devoted to this topic. I would urge this circuit, by rehearing en banc if necessary, at least to consider providing a better rationale for the constitutional holding of Admiral's Cove.
 
 Id. at 912 (footnote omitted).[5]
 
 69
 The easements respectively running in favor of Virginia Power, C & P and AMSAT and in the Master Deed were granted before the Cable Act was enacted in 1984. The Master Deed easement runs in favor of any utility and does run in favor of a company such as Media. However, the grant of easement in the Master Deed reserves to Sequoyah discretion concerning any installation after the initial installation. In this instance, Sequoyah, citing to the exclusivity of its arrangement with AMSAT's predecessor, has in fact refused to permit Media to make such installation. Sequoyah, seemingly, in the absence of the Cable Act, could exercise such right of refusal in so far as the blanket easement is concerned. However, it would appear that such right of refusal, if any, in the absence of the Cable Act, would rest within the power of the specific grantee in so far as the other three easements are concerned. Accordingly, as Judge Henley has indicated, a problem similar to the problem presented in Loretto v. TelePrompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), would appear to be present with respect to all four easements in this case. In that regard, it is to be noted that a taking of an easement is no different than the taking of any other interest in property. "[E]ven if the Government physically invades only an easement in property, it must, nonetheless pay just compensation." Kaiser Aetna v. United States, 444 U.S. 164, 180, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) (citations omitted).
 
 C.
 
 70
 Loretto involved a five-story apartment building in New York City, whose previous owner had granted to TelePrompter permission to install a cable on the building and the exclusive privilege of furnishing cable television to the tenants of the building. In 1971, Loretto purchased that building. Prior to 1973, TelePrompter had compensated Loretto's predecessor and Loretto, and the owners of adjacent properties, in the amount of 5% of the gross revenues which TelePrompter realized from a particular property. Then, in 1973, the State of New York enacted a statute providing that no landlord could "interfere with the installation of cable television facilities upon its property or premises" or demand payment from any tenant for permitting such an installation "in excess of any amount which the [State Commission on Cable Television] shall, by regulation, determine to be reasonable."[6] Pursuant to that statutory authority, the State Commission determined that a one-time one dollar payment would be the normal fee. Loretto, in its complaint, sought, inter alia, the right to require payment by TelePrompter of the fee which TelePrompter was paying prior to the enactment of the statute. Writing for the majority in Loretto, Justice Marshall held that the statutory grant of a permanent right to maintain the television installation on Loretto's property at a rate below the rate which had been previously agreed upon by the property owner and TelePrompter constituted "a permanent physical occupation authorized by government," and "a taking" under the Takings Clause of the Fifth Amendment which required compensation. Loretto, 458 U.S. at 426, 102 S.Ct. at 3171. The size of such physical occupation was held not a factor, as long as a permanent occupation was involved. Id. at 436, 102 S.Ct. at 3176.
 
 
 71
 In FCC v. Florida Power Corp., 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), the Supreme Court, reversing the Eleventh Circuit, held that the federal Pole Attachments Act, 47 U.S.C. § 224 (1988), did not effect a taking of property under the Fifth Amendment. That Act
 
 
 72
 was enacted by Congress as a solution to a perceived danger of anticompetitive practices by utilities in connection with cable television service. Cable television operators, in order to deliver television signals to their subscribers, must have a physical carrier for the cable; in most instances underground installation of the necessary cables is impossible or impracticable. Utility company poles provide, under such circumstances, virtually the only practical physical medium for the installation of television cables.
 
 
 73
 ....
 
 
 74
 In response to arguments by cable operators that utility companies were exploiting their monopoly position by engaging in widespread overcharging, Congress in the Pole Attachments Act authorized the Federal Communications Commission to fill the gap left by state systems of public utilities regulation. The Act provides that any cable company operating in a State which does not regulate the rates, terms, and conditions of pole attachments may seek relief from alleged overcharging before the Commission, which is empowered to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable...."
 
 
 75
 Florida Power, 480 U.S. at 247-48, 107 S.Ct. at 1109-10 (citation and footnote omitted).
 
 
 76
 In his opinion for the Court, Justice Marshall wrote as follows:
 
 
 77
 [The Eleventh Circuit, in its opinion,] found at the outset that the Pole Attachments Act authorizes a permanent physical occupation of property, which, under the rule we adopted in Loretto, is per se a taking for which compensation must be paid. We disagree with this premise, for we find that Loretto has no application to the facts of this litigation.
 
 
 78
 ....
 
 
 79
 We characterized our holding in Loretto as "very narrow." The Court of Appeals in its decision in these cases broadened that narrow holding beyond the scope to which it legitimately applies. For, while the statute we considered in Loretto specifically required landlords to permit permanent occupation of their property by cable companies, nothing in the Pole Attachments Act as interpreted by the FCC in these cases gives cable companies any right to occupy space on utility poles, or prohibits utility companies from refusing to enter into attachment agreements with cable operators.
 
 
 80
 Id. at 250-51, 107 S.Ct. at 1111 (emphasis in original; citations and footnote omitted). Later in his opinion, Justice Marshall stated:
 
 
 81
 This element of required acquiescence is at the heart of the concept of occupation.
 
 
 82
 ....
 
 
 83
 Appellees contend, in essence, that it is a taking under Loretto for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference. The line which separates these cases from Loretto is the unambiguous distinction between a commercial lessee and an interloper with a government license. We conclude that the Court of Appeals erred in applying the per se rule of Loretto to the Pole Attachments Act.
 
 
 84
 Id. at 252-53, 107 S.Ct. at 1112 (emphasis supplied).
 
 
 85
 In this case, Media desires to be, in fact, "an interloper with a government license." Media has no right, independent of the Cable Act, under any relationship, contractual, landlord-tenant, or other, with Sequoyah, any grantee under the Master Deed, or Virginia Power, C & P or AMSAT, to the relief which Media seeks. Rather, Media's asserted right is dependent upon the Cable Act. In a sense, it would appear arguable that that was the situation in both Loretto and Florida Power.
 
 
 86
 As previously indicated in this opinion, the easements granted in favor of Virginia Power, C & P and AMSAT all preceded the enactment by the federal Congress of the statute in question in 1984. Those easements are sufficiently broad to enable each grantee to convey rights in favor of others including a provider of cable television service such as Media. In Salvaty v. Falcon Cable Television, 165 Cal.App.3d 798, 212 Cal.Rptr. 31 (1985), the owner of private property had granted an easement to the telephone company to install, use and maintain a pole line, along with items such as wires. In turn, the telephone company permitted a cable television provider to place its equipment "in or on [the telephone company's] conduit system" and poles, subject to the cable television company "obtain[ing] from 'private owners of real property any or all permits, licenses or grants necessary for the lawful exercise' " of such permission within the provisions of the easement grant itself. Id. 212 Cal.Rptr. at 33 (emphasis added by the California court). In Salvaty, the cable television provider argued that what it proposed to do was within the scope of the easement enjoyed by the telephone company and that the permission of the owner of the property was not needed; the telephone company disagreed. The court agreed with the cable television company and wrote, inter alia:
 
 
 87
 Finally, we note that [Loretto ] on which [the telephone company relies], is clearly distinguishable from the case before us. Loretto held that a New York statute requiring a landlord to permit installation of cable television facilities upon his property amounted to a taking of private property for which compensation was due. Unlike the case at bench, there was no easement of any kind involved in Loretto. Here, we have an easement and the cable equipment was within the scope of that easement.
 
 
 88
 Id. at 36.[7] Insofar as the Master Deed is concerned, it also is dated prior to 1984. It contains a reservation of rights in favor of Sequoyah. Thus, as Judge Henley has suggested in his concurring opinion in White, the exercise by Media of rights under section 621(a) of the Cable Act of 1984 will result in imposing upon Sequoyah, in so far as the blanket utility easement is concerned, and upon the specific grantee, in so far as the other three easements are concerned, a compelled "acquiescence in the installation of cable equipment, as was the case in Loretto." White, 902 F.2d at 912.
 
 
 89
 There is of course a factual distinction between Loretto and this case. In Loretto, the New York statute at issue seemingly gave cable television operators the right to place their equipment on any part of an owner's property of which the operator reasonably required the use. In this case, the federal Cable Act limits such operators to the use of public rights of way and to compatible utility easements. But that distinction would seem immaterial in so far as the constitutional takings issue is concerned.
 
 
 90
 In sum, I believe that this case is controlled by Loretto, and that if Media does exercise the rights which we hold Media has under the Cable Act, a taking would be involved which requires payment of just compensation by Media to Sequoyah and/or one or more of the grantees under the three specific easement grants.
 
 D.
 
 91
 There remains the question of whether or not Congress, in enacting the Cable Act of 1984, intended to permit a franchisee such as Media to achieve, by a private cause of action, a result which constitutes a taking under the Fifth Amendment. The Third Circuit, in Cable Investments, Inc. v. Woolley, 867 F.2d 151 (3rd Cir.1989), answered that question in the negative. District courts which have considered that issue have split with regard to it.[8]
 
 
 92
 As originally introduced into Congress, the legislation which eventually became the Cable Act of 1984 contained section 633 pursuant to which a residential complex would have been specifically required to permit access to providers holding state or local cable television franchises. As drafted, section 633 seemingly would have enabled "franchised cable companies to force their way onto private property, over the protests of the property owner, in order to offer cable television service to the tenants of the property owner." Woolley, 867 F.2d at 155. Section 633, as so drafted, also called upon state or local franchising authorities or the Federal Communications Commission, in the absence of state or local action, to determine, based on certain specific factors, the compensation which the provider would have been required to pay to the owner of the residential complex.[9] The legislative history shows that the drafters of those provisions originally included them to comply with Loretto. However, when the Cable Act was enacted, the original section 633 was eliminated. The argument, see the Third Circuit's views expressed in Woolley, can be made that the elimination of section 633 from the legislation was intended by Congress to call for the property owner to receive reimbursement only for physical damage and not for economic damage. In addition, the persuasive analyses, stated in the majority opinion, surely give me pause concerning the question of whether Congress intended the 1984 legislation to confer upon a franchisee such as Media the right by a private cause of action, to engage in a Fifth Amendment taking. Yet, in my mind, the legislative language and history call for a more expansive reading of the statute than accorded by the majority opinion. See Greater Worcester Cablevision v. Carabetta Enterprises, Inc., 682 F.Supp. 1244, 1259 (D.Mass.1985). Indeed, construing section 621(a)(2)(C) so as to require payment of just compensation for economic as well as for physical damage would give full meaning to the intent of Congress in enacting the Cable Act of 1984 by conferring rights of access to cable television companies, such as Media, to furnish service through existing compatible private easements to residents of developments such as Sequoyah who desire the same. Further, at the same time, such an approach would treat complexes such as Sequoyah, and grantees of easements such as C & P, Virginia Power and AMSAT, in a totally fair manner. Such a construction of section 621(a)(2)(C) would avoid any constitutional problem. In that regard, I too am "guided in no small part by the requirement to interpret a statute when possible to avoid raising constitutional questions," Woolley, 867 F.2d at 159-60 and cases cited thereat, and at the same time to avoid holding the federal Cable Act unconstitutional as would be required if my views of the meaning of the legislation and of the application of Loretto are correct.[10]
 
 E.
 
 93
 The record in this case seemingly does not disclose whether or not the contemplated installation by Media would cause any physical damage to any of Sequoyah's property or to any one or more of the easements granted by the Master Deed or in favor of Virginia Power, C & P or AMSAT. Nor does the record indicate whether or not Sequoyah, Virginia Power, C & P or AMSAT would suffer economic damage if Media should obtain the relief it seeks in this litigation. Indeed, it may be that one or more of those entities would incur net economic gain rather than loss if Media is granted and utilizes the type of relief which Media seeks in this case. On the other hand, it is conceivable that one or more of them could suffer net economic harm, as, for example, by loss of the opportunity to require Media or a company in the position of Media, to pay consideration in order to obtain the access which Media desires. Those questions would raise the need for further factual development and legal exploration concerning physical damage and/or economic damage if the views set forth in this separate opinion had prevailed. Thus, if those views had prevailed, a remand to the district court for further proceedings in accordance with this opinion would have been needed.
 
 
 
 [1]
 The Act is codified at 47 U.S.C. §§ 521-559 (1988)
 
 
 [2]
 For the district court's opinions, see Media General Cable of Fairfax, Inc. v. Sequoyah Condo. Council of Co-Owners, 721 F.Supp. 775 (E.D.Va.1989) and 737 F.Supp. 903 (E.D.Va.1990). The second opinion was issued after counsel, at the request of the court, stipulated as to a number of uncontroverted facts
 
 
 [3]
 As to that intervention, see the discussion infra in Part II of this opinion
 
 
 [4]
 See Booth American Co. v. Total TV of Victorville, No. CV-91-2286-RSWL (C.D.Cal.1992); Elliot & Assocs. Builders Developers, Inc. v. Spotsylvania Television Cable Network, Inc., 12 Va.Cir. 81 (1987)
 
 
 [5]
 In Cable Investments, Inc. v. Woolley, 867 F.2d 151, 154 (3rd Cir.1989), the Third Circuit, while noting Judge Fay's 1988 opinion in Admiral's Cove, did not find it necessary to decide the implied cause of action issue
 
 
 [6]
 Section 633 had a provision that dealt with the issue of what happens when one cable company is already providing service, and another cable company wants to come and offer competitive service. Section 633(h) would have provided that the federal right of access conferred by section 633 would not apply in situations where the landlord provided tenants with an equivalent diversity of information service. See Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd., 678 F.Supp. 871, 873-74 (N.D.Ga.1986), rev'd, 953 F.2d 600 (11th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992)
 
 
 [1]
 In Centel Cable Television Co. v. Admiral's Cove Associates, Ltd., 835 F.2d 1359 (11th Cir.1988), Judge Fay wrote: "[W]e find the determination by [the defendant] that Congress authorized [the plaintiff's] use of public easements but not easements dedicated for use by utilities to be contrary to the legislative history of the Cable Act." 835 F.2d at 1363 (footnote omitted)
 In Cable Holdings, Judge Birch wrote that "although not dispositive, the 'dedication' language of Section 621(a)(2) seems to contradict Smyrna Cable's alleged right to access ... private, non-dedicated easements." 953 F.2d at 606. Judge Birch also wrote with regard to Admiral's Cove and other Eleventh Circuit authority:
 We recognize that those prior cases contain broad language which could be construed as favoring Smyrna Cable's interpretation of Section 621(a)(2). Without exception, this broad language is not necessary for the holdings in Admiral's Cove and Thos. J. White [902 F.2d 905, discussed infra at 1177-78]. We are confident that, in spite of this broad language, these opinions neither contemplated nor approved the power of a franchised cable company to force its way onto private property, over the objection of the property owner, so that the cable company could permanently occupy the owner's apartment buildings and provide competing television service to the owner's tenants. Accordingly, we expressly limit Admiral's Cove and Thos. J. White to the facts involved in those cases.
 Cable Holdings, 953 F.2d at 609 n. 9.
 Accordingly, the Eleventh Circuit has in Cable Holdings apparently rejected the earlier above quoted interpretation of Section 621(a)(2) stated by Judge Fay in Admiral's Cove. Nevertheless, I find myself in agreement with Judge Fay's view for the reasons stated in the body of this separate opinion at 16-17. Accord Booth American Co. v. Total TV of Victorville, No. CV-91-2286-RSWL (C.D.Cal.1992); see also cases cited thereat.
 
 
 [2]
 Accord Cable TV Fund, 14-A, Ltd. v. Property Owners Ass'n, 706 F.Supp. 422, 427-30 (D.Md.1989); Cable Assocs., Inc. v. Town & Country Management Corp., 709 F.Supp. 582, 583 (E.D.Pa.1989); Rollins Cablevue, Inc. v. Saienni Enters., 633 F.Supp. 1315, 1317-20 (D.Del.1986). There are, however, contra interpretations by other courts as the majority opinion indicates
 
 
 [3]
 In this case, the problem of access within a private residential complex and other than merely to the outside boundaries or walls of such a complex, seemingly does not exist with respect to Sequoyah's individual residents who desire to permit access to their own living areas. Nor is there any indication in the record that Media desires to enter upon the property of any resident who does not affirmatively opt to order its service. However, Media apparently does desire to utilize compatible easements which run through common areas of the Sequoyah complex. In Cable Investments, Inc. v. Woolley, 867 F.2d 151, 159-60 (3rd Cir.1989), the Third Circuit construed the Cable Act so as not to confer such a right upon Media. I disagree for the reasons set forth infra in the body of this separate opinion
 
 
 [4]
 "Although federal courts retain theoretical power to invalidate a taking as insufficiently public in purpose even if compensation is provided, the practice since the first third of this century has been to treat as a legislative function the decision of 'what type of taking is for a public use....' " Laurence H. Tribe, American Constitutional Law, § 9-2, at 590 n. 10 (2d ed. 1988) (quoting United States ex rel. TVA v. Welch, 327 U.S. 546, 551, 66 S.Ct. 715, 717, 90 L.Ed. 843 (1946))
 
 
 [5]
 No hearing en banc or otherwise took place. However, the issue has been revisited by the Eleventh Circuit in Cable Holdings, 953 F.2d 600, reh'g en banc denied, 988 F.2d 1071 No. 91-8032 (11th Cir. Apr. 9, 1992), cert. denied, --- U.S. ----, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992)
 
 
 [6]
 New York Exec.Law § 828 (McKinney 1973)
 
 
 [7]
 See also Witteman v. Jack Barry Cable TV, 192 Cal.App.3d 1619, 228 Cal.Rptr. 584 (App.1986), cert. denied, 484 U.S. 1043, 108 S.Ct. 776, 98 L.Ed.2d 862 (1988); Henley v. Continental Cablevision of St. Louis County, Inc., 692 S.W.2d 825 (Mo.Ct.App.1985); Hoffman v. Capitol Cablevision Sys., Inc., 82 Misc.2d 986, 372 N.Y.S.2d 482 (Sup.Ct.1975), aff'd, 52 A.D.2d 313, 383 N.Y.S.2d 674 (1976); Jolliff v. Hardin Cable Television Co., 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588 (1971)
 
 
 [8]
 See Cable Assocs., Inc. v. Town & Country Management Corp., 709 F.Supp. 582, 585 (E.D.Pa.1989), decided in accord with the command of Cable Investments, Inc. v. Woolley, 867 F.2d 151 (3rd Cir.1989). ("Under the Cable Act Congress did not intend to confer eminent domain rights on franchised cable operators."). But see Greater Worcester Cablevision v. Carabetta Enters., Inc., 682 F.Supp. 1244, 1259 (D.Mass.1985) (whether a taking occurs depends on whether the "use of a given easement ... amounts to an additional servitude on the underlying property"). And see also Cable Holdings of Georgia v. McNeil Real Estate Fund, 678 F.Supp. 871, 874 (N.D.Ga.1986), which was the subject of the appeal in Cable Holdings, 953 F.2d 600, discussed supra in the body of this opinion
 
 
 [9]
 See H.R. 4103, 98th Cong., 2d Sess. § 633 (1984), reprinted in H.R.Rep. No. 934, 98th Cong., 2d Sess. 13 (1984)
 
 
 [10]
 I agree with Judge Fay's view as expressed in Admiral's Cove, 835 F.2d at 1363 n. 7, that Congress does indeed possess authority to require that utility easements, such as those provided by the grants to Virginia Power, C & P and AMSAT and in the Master Deed, be available for use by locally franchised cable television providers such as Media. That would clearly appear consonant with public purpose. However, contrary to the views as expressed by Judge Fay in Admiral's Cove and by Judge Johnson in the majority opinion in White, I believe, for reasons stated in this separate opinion, that when an entity such as Media utilizes that power, a taking within the meaning of the Takings Clause of the Fifth Amendment occurs